# Mary M. Springer, Plaintiff in Error, v. David Bradley Manufacturing Company, Defendant in Error.

## Gen. No. 19,996.

1.  CONTRACTS, § 51*—*when finding as to letters constituting sustained by the evidence*. A finding of the trial court on conflicting evidence that a letter alleged to have been written by defendant to plaintiff was mailed to and received by plaintiff and that plaintiff replied by letter and that the two letters constituted a binding contract, *held* sustained by the evidence.

2.  APPEAL AND ERROR, § 1414*—*when findings of trial court will not be disturbed*. In a case tried without a jury, the findings of the trial court on conflicting testimony will not be disturbed by the Appellate Court, unless clearly and manifestly against the weight of the evidence.

3.  ACCOUNT STATED, § 3*—*when account in defendant's books binding on plaintiff*. An account as shown in the books of defendant is binding on plaintiff where the plaintiff in a stipulation admitted that the books showed the indebtedness, and this though the stipulation

reserved to plaintiff the relevancy and admissibility of the account, where it further appeared that the account was made a part of a letter addressed to plaintiff by defendant and plaintiff in a letter written in reply acquiesced and agreed to the account as stated.

Error to the Municipal Court of Chicago; the Hon. OSCAR M. TORRISON, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1914. Affirmed. Opinion filed December 31, 1914.

**Statement by the Court.** This is an action brought in the Municipal Court of Chicago by Mary Morgan Springer, plaintiff in error, hereinafter referred to as the plaintiff, against the David Bradley Manufacturing Company, a corporation, hereinafter referred to as the defendant, for the sum of $3,397, which represents dividends which plaintiff claims were due her from defendant at the time this suit was brought, viz., April 5, 1912. Plaintiff's statement of claim and amendment thereto set forth that the plaintiff owned 316 shares of stock of the defendant; that from January 31, 1910, up to April 5, 1912, various dividends had been declared, the aggregate dividends totaling $3,397. It was stipulated between the parties that all the foregoing dividends were declared, not from earnings of the said Company, but from money realized from the sale of assets disposed of in the liquidation of the defendant. To the plaintiff's statement of claim defendant filed a statement of defense and set-off, verified by J. Harley Bradley, president of the defendant. This statement of defense and set-off did not deny that plaintiff was the owner of the 316 shares of stock, and that as a result of the sale of assets of the defendant Company in liquidation, dividends accrued on plaintiff's 316 shares to the amount of $3,397. Defendant, however, in the statement of defense and set-off, alleges the fact to be that the 316 shares of stock came into the possession of the plaintiff by reason of a distribution of the estate of Mary Ella Morgan, mother

of the plaintiff, who died on or about November 1, 1899; that this distribution was made by written agreement under date of July 25, 1900, to which plaintiff, her father and her five brothers and sisters were parties; that by this agreement all the personal and real property, with the exception of a certain piece of property known as 389 West Adams street, was divided equally among the signers of this agreement, and that these 316 shares of stock represented one-seventh of the number of shares of stock of the defendant owned by the mother, Mary E. Morgan, deceased; that at the time of the death of the said Mary E. Morgan, there was due from her to the defendant $14,444.18, and that after her death, debts of her estate to the extent of $4,357.19 were paid by the defendant, the entire indebtedness being in the sum of $18,801.37; that in a letter written January 15, 1900, the plaintiff was one of five members of her immediate family to request the defendant to advance moneys to the family for household expenses, and agreed to pay her pro rata share of the advances so made, viz., one-fifth; that the advances were to be made in the name of Marion S. Morgan, trustee, a sister of the plaintiff; that acting under said letter, defendant advanced said Marion S. Morgan, trustee, the sum of $9,962.22; that defendant had advanced to plaintiff for personal use, up to November 1, 1901, the sum of $1,040; that on October 31st two dividends—one of six per cent. and one of one per cent—were declared on the stock of the defendant Company; that in a letter written by the defendant to the plaintiff on December 10, 1901, defendant directed the attention of the plaintiff to the fact that an agreement had been entered into by the plaintiff and her father and her five brothers and sisters, whereby each should have one-seventh of the estate of Mary Ella Morgan, deceased mother, and pay one-seventh of all claims against the same; the letter also directed the attention of the plaintiff to the fact that she was one of five that had agreed to pay their pro rata share of the

moneys advanced to Marion S. Morgan, trustee, a
sister of the plaintiff, for household expenses; further,
that an account had been opened on the books of the
defendant Company with each one individually, and
in order that she might understand fully the amount
of the indebtedness and the manner in which it was
divided, he inclosed statements of the various accounts
as they stood on the books of the Company; that said
letter further stated that dividends earned by the stock
up to that time had been credited to the account of the
plaintiff, and that further dividends, when declared,
would be credited to the account; that the account
would bear interest at the rate of six per cent. pay-
able quarterly, the same as the dividends; that to make
everything plain, he inclosed another statement show-
ing how her personal account stood on the books, which
statement showed that there was an indebtedness from
her due the Company of $3,462.90, which included all
cash advanced to her directly for her own personal
use; the letter further provided for an advance of $60
per month for plaintiff's schooling; that the letter also
asked her, in acknowledging receipt of this letter, to
state whether this manner of handling the estate ac-
count was perfectly satisfactory; that inclosed in said
letter were the various statements of accounts men-
tioned therein; that plaintiff in a written reply to the
said letter approved the account set forth in that
letter, acquiesced therein, and stated it was as agreed
upon; that said letter of December 10, 1901, and the
aforesaid reply thereto, constituted a written contract
by which the plaintiff undertook to pay one-seventh of
the indebtedness due from Mary Ella Morgan, de-
ceased, her estate, and the pro rata share of advances
made to Marion S. Morgan, trustee, and the moneys
advanced to her directly for her personal use, and in-
terest on these accounts as mentioned in the letter of
December 10, 1901.

The statement of defense and set-off further set
forth the exact state of the account as defendant claims

between the plaintiff and the defendant at the beginning of this suit; that the total sum of the indebtedness, without allowing any credits, amounted to $16,638.17; that this account was made up of the moneys due defendant by reason of the plaintiff's liability for one-seventh of the indebtedness due defendant for moneys advanced to the mother, Mary Ella Morgan, and her estate, for her pro rata share of the moneys advanced to Marion S. Morgan, trustee, for household expenses, viz., one-fifth thereof, the interest on said indebtedness, and the cash advances which at the time this suit was instituted amounted to $7,671.19. The statement further shows that there was a credit against this of $10,526.31, which consisted of dividends declared before liquidation of the defendant Company and subsequent thereto, and certain moneys due the plaintiff from J. Harley Bradley, trustee, with reference to certain property held by him on behalf of the plaintiff and the other heirs of the deceased mother's estate, which payments had been credited to the plaintiff's account; and that after allowing all just credits, there was due on the claim of defendant's set-off, $6,111.86. To this claim of set-off plaintiff filed an affidavit of merits admitting that the estate had not been probated, and denying that the 316 shares of stock came into her hands by virtue of the agreement dated July 25, 1900, alleging that she took them by inheritance from her deceased mother. It, however, admitted the signing of the agreement of July 25th referred to as exhibit "A;" it further denied that plaintiff agreed to pay one-seventh of the alleged indebtedness of Mary Ella Morgan incurred during her lifetime, or of the estate after her death; denied having entered into any agreement to pay defendant one-fifth of the alleged advances to Marion S. Morgan, trustee, for household expenses; denied that she wrote a letter in reply to defendant's letter of December 10, 1901, (which is designated as exhibit "B"), and therefore did not expressly or by

implication agree or consent to the terms of the said letter. In this affidavit of merits plaintiff sets up further, by way of defense, that the amount representing one-seventh of Mary Ella Morgan's indebtedness, viz., $2,685.91, and the amount representing one-fifth of the indebtedness against Marion S. Morgan, trustee, viz., $1,932.40, were promises to pay the debt of another, and not being evidenced by any note or memorandum in writing signed by the plaintiff, were within the statute of frauds, and therefore could not be enforced; that even if it could be held that the agreement was in writing, that so much of the advances as was made more than ten years prior to the beginning of this suit was barred by the statute of limitations; however, there being no agreement or memorandum in writing, that the entire claim was barred because the right of action did not accrue within five years next preceding the commencement of this action. However, in the plaintiff's brief, items to the amount of $1,696.56 were admitted by the plaintiff as having accrued within the five years prior to the commencement of this suit, and it was conceded should have been allowed against the claim of the plaintiff. Upon the issues here presented, the cause was submitted to the court without a jury. The court found the issues against the plaintiff on defendant's plea of set-off, assessed the damages at $5,693.81, and entered judgment on this finding, to reverse which judgment the plaintiff has sued out this writ of error.

William Slack, for plaintiff in error.

Gardner, Carton & Thomson, for defendant in error; John M. Zane, of counsel.

Mr. Justice Pam delivered the opinion of the court.
The court in its finding allowed the entire claim of the defendant against the plaintiff, save certain items in the nature of compound interest which had been in-

cluded in the indebtedness due the defendant from Mary Ella Morgan, the mother. Although many issues are presented by the various contentions of the parties to this litigation, the one issue determinative of the case is, whether or not a contract or agreement had been entered into between the plaintiff and the defendant by reason of the letter in evidence referred to as exhibit ''B,'' claimed to have been written by the defendant to the plaintiff on December 10, 1901, and a letter in reply thereto, which defendant claims to have received from the plaintiff. The plaintiff denies ever having received the letter referred to as exhibit ''B,'' and further denies not only that she wrote a reply, but, having failed to receive the letter, she could not have written a reply thereto. The relationship of the parties has an important bearing on the determination of this issue.

Mary Ella Morgan, deceased mother of the plaintiff, was the sister of J. Harley Bradley, president of the defendant Company. The evidence shows that an account was carried on the books of the defendant with her; that bills incurred by her were paid by the defendant Company; that it was customary for the Company to pay bills presented which bore the ''O. K.'' of either Mrs. Morgan or her brother, J. Harley Bradley; and the payments as made were charged to her account. It was admitted by stipulation of the parties hereto that at the time of the trial the books of the defendant showed an indebtedness of Mary Ella Morgan to defendant of $18,801.37. The evidence showed that of this amount $14,444.18 was for debts incurred during decedent's lifetime, and $4,357.19 for debts paid after her death.

On January 15, 1900, a short time thereafter, plaintiff, together with her father, her two sisters and a brother, wrote the following letter to J. Harley Bradley, who was then president of the defendant Company:

"CHICAGO, Jan. 15, 1900.

MR. J. H. BRADLEY,

63 N. Des Plaines St., Chicago.

DEAR BROTHER:

Marion, Margia, David and Mary have thought over question of expenses, and consented to have the $5,000 charged pro rata with me; $1,000 each, with understanding that when a dividend be declared, on the stock, it will be credited back and not stand against the principal. Above is, I think, what you desire. So if you will send a check amounting to $416.50 made out to Marion S. Morgan on the first of each month, beginning Feb. 1st, I think everything will be satisfactory.

(Signed) G. C. MORGAN,
MARION SHERMAN MORGAN,
MARGIA CYNTHIA MORGAN,
DAVID BRADLEY MORGAN and
MARY A. MORGAN," (plaintiff).

From this letter it is evident that the family wished to arrange for at least certain family expenses to be paid by the defendant, and that the dividends due on the shares of stock held in the mother's name be applied in payment of any indebtedness created by any advance made by the defendant in pursuance of this letter. At this time plaintiff lacked about six months of her majority.

The estate of Mary Ella Morgan was never probated, but on July 25, 1900, an agreement was entered into between the father and the sisters and brothers of the plaintiff and herself, which provided for the distribution of the estate. At this time plaintiff had already reached her majority. By this agreement all the personal and real property of the estate of Mary Ella Morgan was divided into seven equal parts, save that the father, G. C. Morgan, in addition to his one-seventh, was given the house known as 389 West Adams street, Chicago. At this time, under the stipulation previously referred to, the books of defendant

Springer v. David Bradley Mfg. Co., 191 Ill. App. 45.

showed an indebtedness due from Mary Ella Morgan and her estate, of $18,801.37.

On October 31, 1901, two dividends were declared, one of six per cent. and one of one per cent. Under the distribution agreement of July 25th, *supra,* plaintiff was entitled to 316 shares of capital stock. On this stock, under the dividend declared, plaintiff was entitled to a credit of $2,212. J. Harley Bradley testified that on December 10, 1901, he wrote plaintiff the following letter:

"CHICAGO, December 10, 1901.
MISS MARY MORGAN,
Vassar College.
MY DEAR NIECE:

After thinking over your mother's estate and the manner in which it is now kept on our books, and discussing it with Geo. Jr., we have decided that the best thing to do, while all are well, and in position to understand and express their views, to divide the estate in accordance with the agreement entered into by all of you; viz.: that each one should have one-seventh of the estate and pay one-seventh of all claims against the same, and we have opened an account with each one individually, and in order that you may understand fully the amount of the indebtedness and manner in which it is divided, I give you herewith statement of the various accounts as they now stand on our books, viz.: Account of Mrs. M. E. Morgan; account estate Mrs. M. E. Morgan No. 1; account estate Mrs. M. E. Morgan No. 2; account Marion S. Morgan, trustee; the last account, Marion S. Morgan, trustee, you will readily understand, is the account in which five of you agreed to advance so much towards the running expenses of the house; the statement shows the division, and how it is arrived at. To make everything plain, I enclose another statement showing how your personal account stands on our books after paying the 6 per cent. dividend of July 1st and 1 per cent. quarterly dividend of October 1st, which leaves an indebtedness, as you will see by statement, of $3,462.90. There will be 3 per cent. more dividend payable 1 per cent. quarterly, due

July 1, 1902, which will be credited to your account, and you will be notified when the dividend is declared, and shown exactly how your account stands after the credit. The account will bear interest at 6 per cent., payable quarterly, the same as the dividend. You will understand that this is a dividend for this year only; no assurance of dividend next year, although we live in hopes of dividend each year. Understand these statements represent simply what has been drawn before your mother's death on her account, and after her death up to this time. There is also a $10,000 note at the First National Bank which is also a part of the estate indebtedness, and which will have to be secured by a proportionate amount of stock from each individual heir. There is also a $6,000 note which is secured by certain collateral, and guaranteed by myself to H. A. Gardner. This, I think, covers the whole history of the estate, and while the heirs are not liable for the $6,000 note, excepting Mr. Morgan, Sr., I presume if there should be a bonanza in it, you would all be glad to be, for that reason I think it ought to be a part of the indebtedness of the estate, although your father may feel differently when I talk to him about it. I hope after January 1st to get these notes in shape. I believe a better rate (of interest) can be obtained after January 1st. The $6,000 note will have to be secured by bonds of the Indianola Water Works, and which amount of stock proportionately divided that will make it perfectly good. Now, in acknowledging receipt of this, state whether this manner of handling the estate account is perfectly satisfactory. If it is, I will then have entries made on the books in accordance with statement rendered, and the stock will then be divided, and the company will simply hold double the amount of stock as security to the indebtedness. Believe this plan wise and better for all than to let matter stand as separate account. Still, I shall be governed entirely by the views of those most interested. Shall arrange so you get $60 a month on your account for schooling.

(Signed) J. HARLEY BRADLEY.

P. S.—The amount of stock in your name is 316 shares."

J. Harley Bradley further testified that with said letter were inclosed the statements mentioned therein.

Notice was served upon the plaintiff to produce said letter. It was not forthcoming, plaintiff claiming never to have received it. Mr. Bradley testified that he dictated the letter to his stenographer, Mrs. Maude Smith, and that after Mrs. Smith had transcribed it from her notes, it was handed to him for signature; that he signed same and returned it with all the inclosures to the stenographer for mailing. A copybook, which was admitted to be the copybook of the defendant, was shown to Bradley, who identified a letter therein as being a copy of the original, including his signature, which he dictated, signed and directed Mrs. Smith to mail to the plaintiff.

Mrs. Maude Smith, the stenographer, called as a witness on behalf of the defendant, was shown a letter-press copybook containing a copy of the letter claimed to have been written on December 10, 1901, and identified by Mr. Bradley as a copy of the original he had dictated to Mrs. Smith, signed and directed her to mail to the plaintiff. She testified that the letter-press copybook was used in the regular course of business; that the original letter just above referred to was dictated to her by Mr. Bradley; that she had transcribed same, submitted it for his signature, that it was then taken back to her desk and copied into the letter-press copybook and then put into an envelope with the inclosures and mailed, i. e., put on the mailing desk; and that either she or a man who was dead at the time of the trial attended to depositing letters in the U. S. mail box; that the letter-press copybook referred to was used in the regular course of business; that the letter addressed to the plaintiff appears on page 38 thereof; that letters of a similar character were dictated, signed and directed to be mailed to Sate Allen, a sister; G. C. Morgan, (didn't say whether senior or junior); David Morgan, a brother; Marion S. Pierce, a sister; that these letters appear, respectively, in the

same letter-press copybook on pages 35, 43, 46 and 49, all bearing the same date—December 10, 1901; that as in the letter written to the plaintiff, these letters and inclosures were placed in envelopes, stamped and put on the mailing desk.

Bradley further testified that a reply was received to this letter (of December 10, 1901) from the plaintiff; that the letter in reply was sent to the factory and was placed among the factory files because it related to the account kept on the books of the company; that a diligent search had been made for said letter in all possible places, viz., in the office, in the desk in the vault, that hours had been spent hunting for. the missing letter, but that it could not be found. The evidence shows that a fire occurred at defendant's factory in February, 1911, wherein many letters were destroyed. The court permitted Bradley, over the objection of the plaintiff, to testify as to the contents of the letter. He testified that the plaintiff in said letter stated that she had received defendant's letter of December 10, 1901; that the action proposed therein was satisfactory and that it was as agreed upon. Plaintiff denied the receipt of the letter of December 10, 1901, and denied having written a letter in answer thereto.

This letter of December 10th clearly called to the attention of the plaintiff the fact that the real and personal property of the estate of Mrs. Morgan had been divided into seven parts; that the parties to this agreement each should have one-seventh thereof, and assume one-seventh of all claims against same; that an account had been opened on the books for each individual, so that they might understand fully the amount of the indebtedness and the manner of dividing it. Attention was then called to the account of Mary Ella Morgan, the mother, during her lifetime, and payments made on behalf of her estate; and also to the account created by reason of the letter of January 25, 1900, whereby the plaintiff and four others requested defendant to advance a certain amount per

Springer v. David Bradley Mfg. Co., 191 Ill. App. 45.

month to Marion S. Morgan, trustee, for household expenses; (this account is shown on the books in the name of Marion S. Morgan, trustee). The letter further stated, "to make everything plain," there was inclosed a statement of her personal account as it appeared on the books after crediting it with the $2,212 dividend of October 31, 1901, which statement showed an indebtedness of $3,462.90. The letter further called attention to another dividend to be declared July 1, 1902, of three per cent., which would be credited to her account; that "the account will bear interest at six per cent. (6%), payable quarterly the same as the dividends," and calls attention that while there was a dividend this year, there was no assurance of a dividend next year or any other year; that the accounts inclosed with this letter showed how the balance due on November 1, 1901, was arrived at; that the letter also asked plaintiff in acknowledging receipt of it, to state whether this manner of handling the estate account was perfectly satisfactory.

At the trial "a table of balances and analysis" was prepared by the defendant, which was considered by the court as a correct statement of the account between the plaintiff and defendant; and after having found the issues in favor of the defendant on its plea of set-off, the court used this table as a basis of his finding as to the amount due the defendant from plaintiff.

The only respect in which this "table of balances and analysis" differs from the account submitted in the letter of December 10, 1901, is that the court having found that interest upon the accounts of Mary Ella Morgan, estate of Mary Ella Morgan, and Marion S. Morgan, trustee, had been compounded, deducted the interest so compounded. The new total as arrived at by such reduction accounts for the change in the amount claimed by the defendant due it from the plaintiff, in its statement of defense and set-off, and the amount allowed as found by the court upon which he based his judgment.

In using this "table of balances and analysis" as the basis of its judgment, it is evident that the court held that the letter of December 10, 1901, from defendant to plaintiff, and the reply thereto by the plaintiff to the defendant, constituted a contract. To arrive at that conclusion, the court had to determine: (1) That the letter of December 10, 1901, was sent and a reply received; and (2) as a matter of law, that such letter and reply thereto constituted a valid and binding contract between the parties.

In arriving at its conclusion as to whether or not the letter of December 10, 1901, had been sent and a reply received, the court, trying this case without a jury, was called upon to weigh the evidence.

On the question whether or not the letter of December 10th had been sent, there is the testimony of J. Harley Bradley that he dictated the letter to the stenographer; the testimony of the stenographer who took the dictation of the letter; the fact that this letter appeared in a copybook used in the regular course of business; that it was one of a series of letters appearing in due order in said copybook; that other letters in this series in the copybook were addressed to the brothers and sisters of the plaintiff.

As to whether or not plaintiff wrote a reply to that letter, there is the testimony of J. Harley Bradley, president of the defendant Company, against the testimony of the plaintiff. There are circumstances in the evidence which might be cited by this court as corroborative of both the testimony of Bradley on behalf of the defendant, and that of the plaintiff on her own behalf. The court, in finding the issues for the defendant, must have concluded that the defendant had shown by the greater weight of the evidence that the letter of December 10, 1901, was sent, and that the plaintiff replied thereto in the manner and in terms as testified to by J. Harley Bradley. Plaintiff complains that this finding is clearly and manifestly against the weight of the evidence.

The court, trying this case without a jury, saw and heard both of them testify, and in arriving at a conclusion as to which side had maintained the issues contended for by a preponderance of the evidence had the right to take into consideration the appearance and demeanor of the witnesses on the stand. We would not be warranted in disturbing the finding of the court unless it were clearly and manifestly against the weight of the evidence. In the case of *Hess v. Killebrew,* 209 Ill. 193, the Court said, (p. 200):

"Where the trial court, in a trial without a jury, has had an opportunity of seeing the witnesses and of hearing their testimony as it is delivered orally, the findings of such court upon mere questions of fact, when the testimony is conflicting, will not ordinarily be disturbed, on appeal, unless such findings are clearly and manifestly against the preponderance of the evidence. *Lane v. Lesser,* 135 Ill. 567; *Burgett v. Osborne,* 172 id. 227; *Delaney v. Delaney,* 175 id. 187; *Phelan v. Hyland,* 197 id. 395."

In the case of *Calvert v. Carpenter,* 96 Ill. 63, Mr. Justice Mulkey, in delivering the opinion of the court, uses language which we think is especially applicable to the case at bar. He says (p. 67):

"It can scarcely be repeated too often, that the judge and jury who try a case in the court below have vastly superior advantages for the ascertainment of truth and the detection of falsehood over this court sitting as a court of review. All we can do is to follow with the eye the cold words of the witness as transcribed upon the record, knowing at the same time, from actual experience, that more or less of what the witness actually did say is always lost in the process of transcribing. But the main difficulty does not lie here. There is an inherent impossibility of determining with any degree of accuracy what credit is justly due to a witness from merely reading the words spoken by him, even if there were no doubt as to the identity of the words. However artful a corrupt witness may be, there is generally, under the pressure of a skillful cross-examination, something in his manner or bear-

ing on the stand that betrays him, and thereby destroys the force of his testimony. Many of the real tests of truth by which the artful witness is exposed, in the very nature of things cannot be transcribed upon the record, and hence they can never be considered by this court. For this reason the rule is firmly established, that where, as in this case, there is an irreconcilable conflict in the testimony, this court will not reverse the judgment of the trial court, where the evidence of the successful party, when considered by itself, is clearly sufficient to sustain the verdict.''

While we are mindful that the rule as stated in the last sentence has been modified by a more recent decision (*Donelson v. East St. Louis & S. Ry. Co.*, 235 Ill. 625), nevertheless such decision does not detract from the truth and vigor of the sentiment expressed by the court as to the value of personal observation of the witnesses by the trial judge in determining the credibility of the witnesses. Having in mind the views so clearly expressed in the above quotations, and after a careful examination of the record, we feel that we cannot say that the finding of the court under the circumstances in evidence in this case was clearly and manifestly against the weight of the evidence.

The court, after having determined that the defendant had proven by a preponderance of the evidence that the letter of December 10, 1901, was sent and was received by the plaintiff, and that the plaintiff replied acknowledging receipt of that letter and expressing her accord therewith, construed these two letters as constituting a binding and valid contract between the plaintiff and defendant. Our reading of the letters and evidence in this case satisfies us that the construction placed on these letters by the trial judge was the correct one.

Necessarily having determined that a contract existed between the parties, there remained only the question of accounting.

Upon this question there was practically no issue in the case. Plaintiff in the stipulation admitted that

the books showed the indebtedness of the mother, and while it reserved to the plaintiff the relevancy and admissibility of the account, yet inasmuch as that account was made a part of the letter, and the court having held that the plaintiff acquiesced and agreed to said accounting in that letter, the account shown in the books became binding upon the plaintiff. There was no dispute as to the amount paid on account of Marion S. Morgan, trustee under the agreement of January 15, 1900, nor was there any dispute as to the entire amount advanced personally to the plaintiff by the defendant. The testimony shows that in addition to the $1,040 advanced to her up to November 1, 1901, there were additional advances made to her, so that at the time of the trial the entire amount was shown to have been $7,671.19.

While the plaintiff complains that the court erroneously permitted interest to be charged in the defendant's claim of set-off, yet the contract in this case permitted interest to be charged at the rate of six per cent.

Plaintiff also raised the question that that part of the claim which arose out of the indebtedness incurred by the deceased mother during her lifetime, and the amount paid out by defendant for the indebtedness against her estate, could not be enforced because they were based upon a promise to pay the debt of another, and that there was no memorandum in writing evidencing same. In view of the fact that we are of the opinion that there was a written contract, this contention necessarily must fall.

Plaintiff further contended that the entire action was barred by the statute of limitations. She, however, concedes that under section 17 of the Limitation Act (Hurd's R. S. of Illinois, ch. 83, J. & A. ¶ 7212), defendant had the right to set off claims against the plaintiff which were not barred on January 31, 1910, being the earliest item sued for by the plaintiff. This

issue is disposed of by our holding that there was a written contract entered into by the parties in December, 1901. By this written contract, plaintiff agreed to pay all items prior to that period, and authorized charging her account with later items making up the amount of the judgment not covered by this written agreement.

Finding no reversible error, the judgment of the Municipal Court will be affirmed.

*Affirmed.*

